JOURNEYMAN BARBERS, HAIRDRESSERS & PROPRIETORS INTERNATIONAL UNION OF AMERICA, LOCAL NO. 129, Plaintiff, v. STEFANO, Defendant.

Common Pleas Court, Cuyahoga County.

No. 724670.   Decided November 30, 1959.

554

Mr. *Benjamin Reich*, for plaintiff.
Mr. *Sidney B. Fink*, for defendant.
Mr. *Henry W. Stark*, *amicus curiae*.

JOHN V. CORRIGAN, J. This cause came on for hearing on the 20th day of July, 1959, upon the petition, the answer of the defendant, the reply of the plaintiff, and the evidence, and upon consideration thereof the Court makes its findings of fact and separately therefrom its conclusions of law.

## FINDINGS OF FACT

The Court finds that the plaintiff filed its petition on June 15, 1959, praying for a declaratory judgment and injunctive relief in two separate causes of action; that the plaintiff is an organized, unincorporated labor association, as its name indicates, composed of journeyman barbers, hairdressers, cosmetologists and numbering amongst its members both proprietors and employees; that the defendant began barbering in this County in 1932, later becoming a proprietor and continuing to work with the tools of the trade, but never made application for union membership although he knew of union's existence; that on the 3rd of October, 1958, the defendant made

application for a permit to the State of Ohio to operate a barber shop at 4269 West 35th Street, Cleveland; that one John P. Lourens, a member of the State Board of Barber Examiners, inspected the premises and issued the permit on the 20th day of October, postdating the same for the opening on the 22nd day of October, 1958; that the defendant signed the agreement with the plaintiff (the same Mr. Lourens affixing the authorized signatures of the President and Secretary-Treasurer of the Union) on the 27th day of October, 1958; that the defendant voluntarily, without any force or coercion being used, signed the agreement with the plaintiff, wherein he agreed in part as follows:

"2. It Is Understood and Agreed that the party of the second part (defendant herein) shall not open their barber shop before 8 o'clock A. M. or close said barber shop later than 6 o'clock P. M. on any day and that said barber shop shall remain closed all day on Sunday. . . ."

"3. It Is Further Understood and Agreed that the salaries, commissions and Health and Welfare paid to or for employees shall be based on the minimum service charges hereinafter provided in this Agreement which will not be less than the following: Adult Hair Cut $1.75, Children Hair Cut $1.50. . . ."

"14. It Is Further Understood and Agreed that any shop owner signing this Agreement shall display the Union Shop Card, and shall not permit the following unfair trade practices: Rendering of any services to a patron not less than the minimum prices established in said trade area or jurisdiction. The payment or allowance or rebates, refunds, commissions, credits or unearned discounts, whether in the form of money or otherwise, or the extension to certain customers of special privileges not extended to all customers. . . .;"

"19. It Is Further Understood and Agreed that this Agreement shall be in full force and effect from and after the 1st day of August, 1955, until May 31, 1956, at which time it shall be automatically renewed for a period of 1 year from that date, and thereafter each year upon the anniversary date, without further notice, provided, however, that either party may open this Agreement for the purpose of discussion or revisions upon written notice being served upon either party by the other not less than 30 days prior to expiration of this Agreement."

that the defendant admittedly kept his shop open for business until 9:00 P. M. on Monday and Friday of each week; that customers presenting a discount coupon card printed by the defendant and distributed throughout the neighborhood were charged $1.25 for an adult haircut and $1.00 for a children's haircut; that the defendant had ordered and received the discount cards more than one week prior to the date of the opening of the shop; that the defendant displayed the union shop card but eventually removed it from public view by placing the same in a drawer; that defendant paid an initiation fee and dues, paying $5.00 to Mr. Lourens on the 27th day of October, and paying $20.50 to the union by check on the 2nd day of February, 1959, including dues from March and April, 1959; that the plaintiff has a current membership of 946 barbers, hairdressers, cosmetologists and proprietors; that there are "ten to fifteen shops within one mile" of the defendant's shop including three non-union shops charging 85c for an adult haircut, one being within one-half mile; that the so-called non-union shops have permits and licenses to operate; and, finally, that the defendant did openly and admittedly violate the second, third, and fourteenth provisions of the Agreement.

## CONCLUSIONS OF LAW

The Court concludes from the facts found and all the evidence submitted that the Agreement entered into by the respective parties is a binding contract enforceable against either of the parties thereto. Without any question, the dual role played by John P. Lourens, first, as a member of the Barber Board examining on behalf of the State of Ohio, and, secondly, as a representative of the plaintiff negotiating this Agreement, warrants the immediate attention of the appointing authority of this State. However, the defendant's own testimony, on direct as well as cross-examination, falls far short of establishing any clear and convincing evidence of duress. A barber in this area for twenty-seven years, the defendant admitted knowing of non-union shops in the vicinity and the fact that he could operate with the proper license and permits without joining any association. Initially, he indicated his willingness to join but indicated he desired to wait three or four months. Apparently for the advantages he foresaw, he signed on October

27, 1958, although it was actually February 2, 1959, before he completed paying his initiation fee.

While a question can be raised about the uncertainty and indefiniteness as to length of time of the Agreement because of the language used and testimony of the witnesses, the intent of the parties to enter into a one-year renewable contract is clear. The printed contract form is a standard agreement and not a specially drafted instrument for this one proprietor-member. Section 19 does establish May 31st of each succeeding year as "the Anniversary date" of the contract, while the reference to 1955-56 is the initial year covered by the form. Obviously one signing the form in 1958 must realize that the reference to prior years is of no consequence to this particular agreement. A more serious question can be raised relative to a termination date of the Agreement as the language of the Section provides for "discussions or revisions," but is silent as to a withdrawal terminating the automatically renewable contract. Does this silence provide the defendant with a technical escape hatch to void the Agreement on the ground of uncertainty of duration? We think not. Courts generally will construe such language with a view toward carrying out the intention of the parties. In the testimony in this case the parties were agreed that they were considering and discussing a one-year contract. Certainly in the enlightened 20th Century one signing an agreement with a clause setting forth an automatic renewal date and providing for discussions or revisions annually, if desired, cannot be said to be binding himself for life to a contract not of his liking. Poor draftsmanship of the instrument by the plaintiff's legal representatives are the kindest words to best describe this entire Agreement. However, the language is not indefinite or uncertain to the extent that would render the contract invalid and nullify the clear intent of the parties.

The plaintiff herein has been described by counsel under a variety of different labels, including "a voluntary labor association," "a labor union," "a guild," and "an illegal combination of employers and employees for the fixing of prices." Mr. Lourens who acted for the plaintiff and negotiated the Agreement with the defendant, according to the testimony, is a member of the Union and at the same time is the President of

the Employers Guild No. 1 which operates within the Union framework. The exact nature of the plaintiff organization becomes important for the purpose of determining its rights to seek the enforcement of the Agreement and at the same time to resolve the question of price-fixing affecting the legality of the contract.

This Court concludes that the plaintiff union constitutes a hybrid labor organization formed in the interest of standardizing wages, providing health and welfare benefits, and improving the working conditions of its members. All of these purposes are recognized as legitimate ends of bona fide labor organizations. Any valid agreement giving rise to these rights generally are enforceable in the courts of this jurisdiction. The butcher, the baker, and the candlestick maker referred to in the old rhyme, not to mention the traditional grocer, and the era of small service trade operations have been rapidly passing from the American scene. Contrary to the trend toward larger operations the barbering trade for the most part is practiced in small establishments containing two or three barber chairs. A close personal relationship exists between the proprietor and the employee and they share a mutual interest in the trade they practice which partially, at least in the Court's opinion, explains the hybrid labor organization which has resulted.

Individuals engaged in the same trade have the right to combine in an organization or association, whether referred to as a labor union or a trade guild, reasonably to promote the best interests of its members, to discuss all things affecting the interests of its members, as well as the interests of the customers of the trade, and among other things discuss prices, but they do not have the right to restrain trade unreasonably to the prejudice of the public by attempting to maintain the minimum prices established by coercive measures.

The mere existence and operation of the plaintiff organization under agreements similar to the one in question does not constitute an unlawful combination under the Valentine Act. That law condemns only combinations having for their purpose restraints on trade or commerce. To hold otherwise would result in declaring practically all business associations illegal. Whether a covenant in a contract seemingly in restraint of trade

is reasonable under the circumstances is a question to be determined in the light of all the facts surrounding the particular agreement.

Clearly agreements entered into for the sole purpose of restraining trade, or restricting or destroying competition, or fixing prices are illegal.

However, as it is pointed out in a brief summary of Ohio law founded in 27 Ohio Jurisprudence, at pages 169-170:

"Not every transaction involving some restraint of trade or competition is illegal, for, if such were the case, many transactions which no one questions would be invalid. In general the policy of the law condemns only those transactions which in their effect upon trade, business, or competition are unreasonable; and, in any doubtful case, the question, in the last analysis, is one of public policy, to be determined in view of all the circumstances."

In the instant case according to the language of the Agreement,

"it is the desire of both parties to this Agreement to maintain a high standard of service to the public, to improve working conditions and to promote harmonious relations between themselves."

It is entirely manifest that the intention here was not to restrain trade, but to associate themselves in a voluntary organization and to enjoy the benefits resulting from uniformity on the subject of wages, hours of service, general working conditions, and payments into a health and welfare fund. These are lawful and reasonable objects today and a combination to accomplish them should not be denounced as contrary to public policy.

Nothing in the anti-trust laws should be construed to forbid the existence and operation of a voluntary organization of men in the barbering trade from seeking the legitimate objects evidenced by the Agreement herein. The plaintiff union should not be held in itself, simply because of its existence and operation, to be an illegal combination or conspiracy in restraint of trade.

The Court hastens to emphasize that this conclusion should not be construed as giving judicial sanction to purely price-fixing agreements or to the practice of attempting to maintain

560

the prices established by coercive measures against non-members.

The mere inclusion of section three in the Agreement, considering the type of the business, the voluntary nature and purposes of the organization, its non-injurious effect upon the public, and resultant slight restraint of trade, does not invalidate the Agreement or render it unreasonable and void as against public policy.

The evidence in this case revealed that the defendant herein voluntarily agreed to associate himself with some of his fellow-tradesmen for the advancement of the legitimate objects of the plaintiff union by signing a binding contract. Since money damages can not be determined or adequately compensate for the admitted violations of the terms of the Agreement which is unique and of benefit to all the membership of this hybrid labor organization, the Court invokes its equitable powers and directs the defendant to comply with the terms of the Agreement until May 31, 1960.

A Journal Entry will be prepared accordingly with exceptions to the defendant.